**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| VALUED PHARMACY SERVICES OF THE MIDWEST, LLC D/B/A NFP RX SOLUTIONS, <br><br>                  PLAINTIFF, <br><br> v. <br><br> AVERA HEALTH PLANS, INC., <br><br>                  DEFENDANT. | Case No. _4:22-cv-4032_____ |

**COMPLAINT**

COMES NOW Plaintiff Valued Pharmacy Services of the Midwest, LLC d//b/a NFP Rx Solutions ("**VPS**"), and for its Complaint against Defendant Avera Health Plans, Inc. ("**Avera**"), states as follows:

**PRELIMINARY STATEMENT**

1. The pharmacy benefits world is complex, but Avera's scheme in this case was simple: Avera tricked VPS into providing Avera the information, services, and work product Avera needed to save millions of dollars per year in connection with its specialty pharmacy benefit program, then pretended it had decided not to use VPS's information, services, and work product after all, to avoid paying VPS.

2. In reality, Avera is using the information, services, and work product provided by VPS in connection with the design, validation, and implementation of a customized specialty pharmacy benefit program for Avera—all without paying for it.

3.      Avera reaped the benefits of VPS's proprietary industry knowledge, special industry relationships, and hundreds—if not thousands—of hours of customized work undertaken on an expedited basis to accommodate Avera's requested timeline for implementing the new plan.

4.      After months of working together, and after Avera had received all of the components of the specialty pharmacy benefit program VPS had designed and created for it, Avera abruptly told VPS that Avera would not be moving forward with implementing the program. Avera further claimed it had known VPS's plan concept all along, and VPS had provided little of value, claiming that most of the value was in changing the plan design to utilize a twenty percent coinsurance rate, which Avera contended was not a proprietary coinsurance amount.

5.      VPS was shocked by Avera's decision, as well as its statements. VPS had worked long hours over eight months to develop, validate, and operationalize the program for a January 1, 2021 start date.

6.      Avera's sudden about-face not only was incongruent with its business dealings with VPS up to that point, it also made little financial sense for Avera. VPS's program would have saved Avera millions of dollars per year. And, thanks to VPS, virtually all the work had been done to complete its implementation.

7.      Unbeknownst to VPS, Avera's course of conduct was intended to extract and retain the value of all of the work VPS had provided, without paying for such work.  Approximately one month after being told that Avera would not be moving forward with the program, VPS was contacted by one of Avera's members who had received a letter from Avera. The letter sent by Avera was based upon the letter VPS provided to Avera as part of its efforts to design and

implement the new program. Tellingly, although Avera removed one reference to VPS in the letter, it forgot to remove a second reference to VPS, and also failed to remove VPS's telephone number. VPS has since heard from two additional Avera members who received similar letters. The recipients of these letters worked for different employers. From these letters, it is clear that Avera has simply taken VPS's work product, implemented all elements of the program that VPS spent countless hours developing, and is utilizing and reaping the benefits of VPS's work.

8.     Avera fraudulently and unjustly induced VPS to provide extensive services, proprietary information, and work product to Avera in connection with the design, validation, and implementation of a specialty pharmacy benefit program, and Avera fraudulently and unjustly accepted and retained the benefits of that work without compensation to VPS, while misleading VPS into believing that Avera would pay Avera for its work and maintain an ongoing relationship. Then, when Avera abruptly reneged on finalizing a master services agreement—after months of work by VPS, at a time when VPS had completed all work necessary to implement the new program design—Avera falsely claimed that Avera would not be moving forward with implementation of VPS's program and that the work provided by VPS was worthless.

9.     VPS is entitled to compensatory and punitive damages.

## THE PARTIES

10.     Plaintiff VPS is a limited liability company organized under the laws of the State of Missouri. Its principal office is located at 691 Trade Center Blvd., Chesterfield, Missouri. VPS has two members: NFP Corp. and NFP Resources V Insurance Agency, Inc. NFP Corp. is a corporation that is incorporated in Delaware, with its principal place of business in New York.

3

NFP Resources V Insurance Agency is a corporation incorporated in New York, with its principal place of business in New York.

11.     Defendant Avera is a corporation organized and existing under the laws of the State of South Dakota, with its principal office located at 5300 S. Broadband Lane, Sioux Falls, South Dakota.

## VENUE AND JURISDICTION

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Avera, because Avera's state of incorporation is South Dakota, and its principal office is within South Dakota and within this district.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2), and 1391(d).

## GENERAL ALLEGATIONS

15.     VPS is a pharmacy benefits management ("**PBM**") consulting firm. It works with employers and other health plan providers to develop customized pharmacy benefit plans. These plans maximize pharmacy benefits for end users while also identifying cost-saving solutions for VPS's clients, employers or health plans who administer pharmacy benefits.

16.     Avera is a health plan provider that serves more than 85,000 customers. Avera manages health benefits for individuals, families, and employee groups by providing medical care for these plan participants directly or through insurance, reimbursement, or otherwise.

**<u>Avera's Initiation of the Consulting Relationship with VPS</u>**

17.     In or around February 2020, Avera reached out to VPS through Avera's agent, Axia Strategies ("**Axia**"), to inquire about the solutions VPS might be able to provide Avera.

18.     Avera was trying to cut costs for its "specialty" pharmacy benefits plan.

19.     Unlike retail pharmacies, specialty pharmacies focus on complex and chronic conditions requiring specialty prescriptions. These prescriptions generally require special handling and administration, and they can be prohibitively expensive.

20.     Manufacturers of these specialty medications often provide certain patients with incentives or rebates via "copay cards." Employers and health plan providers can also tap into discounts and savings, but they must implement a unique pharmacy benefit design and savings program like the one VPS designed for Avera. If the employers and health plan providers do not implement the unique benefit design and savings program, they will not realize the discounts or savings. All of these incentives have complex conditions and certain limitations, which vary by medication.

21.     Through years of research and through its industry relationships, VPS has developed an exhaustive and proprietary compilation and understanding of these copay card programs, discounts, and other incentives, their conditions, and limitations, and VPS has developed a proprietary methodology for understanding and evaluating the specific incentives available to offset the costs of specialty medications.

22.     Prior to reaching out to VPS about a redesign of its specialty pharmacy program, among other things, Avera was helping patients sign up for copay cards to reduce patient copays, but Avera itself was not realizing any savings. Avera had also tried to work with at least one other

PBM consulting firm, PillarRx Consulting, LLC, which is also located in St. Louis, Missouri. PillarRx was unable to provide a solution meeting Avera's specific requirements.

23.     In or around February 2020, Avera stated that it desired to engage VPS to assist Avera with developing a strategy to lower its specialty pharmacy benefits costs.  However, Avera claimed that it did not have funds to pay for an upfront consulting fee, so the parties agreed and Avera promised that Avera would pay for VPS's information, services, and work product through a shared savings model, rather than on an hourly basis or other pay-as-you-go arrangement.

24.     A shared savings model is a typical compensation arrangement for VPS's customers, because the benefits of VPS's work (the savings) are realized on the back end of the transaction.

25.     In February 2020, March 2020, and May 2020, Luke Merkel represented to VPS that Avera understood VPS's commission structure to be 20 percent of Avera's savings from VPS's program.

26.     On April 10, 2020, Luke Merkel stated on a call with Nelly Rose and Dave Lee of Avera that he was committed to working with VPS and to getting something in place for a start date of January 1, 2021.

27.     During a phone call in May 2020, Luke Merkel again confirmed the parties' agreement, telling VPS that Avera was filing a plan design change with relevant regulators, which meant that Avera was moving forward with the agreement with VPS.

28.     On June 11, 2020, on a call with individuals from Avera, Axia, VPS, and the CVS group, Luke Merkel stated that Avera was "in operation mode" with VPS's program.

29.     On information and belief, Avera's statements were not true at the time they were made but were intended to and actually did cause VPS to rely on them.

30.     In reliance on Avera's agreement, statements, and representations, VPS began providing information, services, and work product to Avera to design, validate, and implement a new specialty pharmacy benefits program that would significantly lower Avera's specialty pharmacy benefits costs.

31.     Avera signed a non-disclosure agreement (the "NDA") on March 23, 2020, in furtherance of this relationship. A true and accurate copy of the NDA is attached to the Complaint as **Exhibit A**.

### VPS Begins Work on a New Specialty Pharmacy Benefits Program for Avera

32.     In reliance on Avera's signature on the NDA and Avera's repeated promises and agreement to pay VPS with a percentage of the savings realized after implementation of VPS's specialty pharmacy benefits program, and pursuant to Avera's request, VPS designed a specialty pharmacy benefits program for Avera that would result in significant savings to Avera—millions of dollars per year—compared to Avera's existing specialty pharmacy benefits plan, which only benefitted the patient and did not realize any potential cost savings for Avera.

33.     The program VPS developed for Avera included a variety of elements that, in combination, innovatively addressed Avera's unique needs. Among other things, this program (1) involved a change to Avera's coinsurance on specialty drugs, (2) required the removal of Avera's copay maximum limits, (3) used Avera's 30-day supply limit, (4) utilized Avera's exclusive specialty pharmacy network, and (5) enabled Avera's enrollment in a specialty accumulator

adjustment program. VPS's program built on VPS's industry knowledge, relationships, and proprietary information and methodology.

34.     Among other things, the program that VPS developed for Avera would achieve cost savings for Avera by changing the copay structure for Avera's members.  Specifically, each member's copay obligations would be increased, but (somewhat counterintuitively) the members' overall financial burden would not increase, because the increased co-pay obligations would be offset by other financial incentives (copay cards, discounts, etc.) available from various manufacturers for various specialty pharmaceuticals.

35.     VPS undertook significant work on behalf of Avera to finalize this program and make appropriate adjustments to ensure that it would work correctly and result in savings for Avera while not increasing the financial burden for Avera's specific members population, and to successfully implement it in compliance with applicable rules and regulations.

36.     Because Avera wanted to operationalize the program for a January 1, 2021 start date, VPS had to act quickly over the course of 2020 to develop, validate, and implement the program in order to meet that deadline.

37.     Ultimately, VPS timely developed, validated, and began implementation of a specialty pharmacy benefits program for Avera that, properly implemented, would result in savings for Avera of approximately 15 million dollars over three years.

### VPS's Analysis and Validation of the New Program for Avera

38.     To enable VPS to develop and validate a new design for the specialty pharmacy benefits program, Avera provided VPS with extensive raw claims data concerning Avera's specialty pharmacy customers. Using its proprietary methodology, VPS then processed, reviewed,

and analyzed this data, to understand what Avera's costs and its members' benefits would look like for each and every relevant member under VPS's proposed program design.

39.   Avera has three separate "companies" or groups of health plan members: small and large commercial customers, employees, and commercial individual customers. VPS's analysis provided detailed information for each of these three categories of Avera customers.

40.   Once Avera received VPS's analysis, Avera understood how VPS's program design would operate in practice and the results it would obtain for Avera and its members. Importantly, VPS's analysis provided Avera with the understanding and comfort that Avera's members would still be protected under this program (that is, their financial burden would not increase after implementation), and Avera knew exactly how much manufacturer assistance could be relied upon for each medication and for each member.

41.   VPS's program design would allow Avera to minimize its costs and maximize all sources of financial assistance, whereas other potential programs could cause Avera to lose essential manufacturer rebates.

42.   VPS continued to prepare detailed savings analyses to give Avera confidence in the soundness of VPS's program.

43.   Ultimately, the analysis that VPS provided to Avera gave Avera the confidence it needed to proceed with the restructure of its program. In addition to specific information about manufacturer incentives, VPS also provided crucial, proprietary information regarding limited distribution drugs, and specialty drugs that did not offer copay cards or other incentives.

### VPS's Initial Work to Implement the New Program for Avera

44.   From the parties' earliest communications in February 2020, Avera discussed and understood VPS's commission fee structure. With a full understanding of and agreement to pay

the fee that VPS expected to receive, Avera moved forward with VPS, entering a non-disclosure agreement, requesting a new program design and validation of that design, requesting implementation of the new program, and otherwise accepting the benefits of VPS's services and work product.  In reliance on Avera's promises and agreement to pay, and pursuant to Avera's request, VPS provided and continued to provide the information, services, and work product for the new program.

45.     Satisfied with the results of VPS's analysis validating the new program, in May 2020, Avera decided to formally change the plan design Avera had on file with at least two states, to be effective January 1, 2021. This new plan not only changed Avera's coinsurance amount to 20 percent, but it also removed copay maximums—something Avera had never done before.

46.     In addition, VPS prepared specific summary benefits language for Avera's summary benefits guide, as well as language for Avera's summary of plan documents.

47.     The language provided by VPS included the following:

> To help offset your out-of-pocket costs for specialty medications, a Specialty Copay Assistance program is available to you. The clinical team at VPS will help you receive manufacturer copay assistance to cover most, if not all, of your out-of-pocket expenses for your specialty medications. For more information and to enroll in the program, contact VPS at 1-888-201-9175 prior to filling your specialty medication.

48.     Avera requested additional copies of this language via email in May 2020.

49.     Around the same time, Avera asked VPS to draft and send Axia a master services agreement for the parties' relationship.

**VPS's Additional Work to Implement the New Program for Avera:**
**CVS, Avera's Specialty Pharmacies, and the Accumulator Adjustment**

50.     For the next several months in 2020, VPS continued providing critical assistance setting up the new program for Avera and enabling its implementation, including extensive work on the backend operations of the program.

51.     While implementation of a new program always requires significant work, implementation of the specialty benefit program designed by VPS for Avera was particularly complicated and extensive.   In order to maintain the integrity of the plan design and ensure compliance with applicable rules and regulations, Avera would need to ensure that only a member's out-of-pocket costs (i.e. the payments that each member made)—and not the amount of any copay card, discount, rebate, or other incentive that reduced the member's burden—would count toward the member's deductible.

52.     To accomplish this, Avera would need to have a process for coordination of benefits with Avera's claims adjudicator, CVS Health ("**CVS**"), in order to apply an "accumulator adjustment" and ensure that only a member's out-of-pocket costs were accumulated and counted toward the member's deductible.

53.     By way of example, without the accumulator adjustment, a member with a $1,000 deductible who received a $1,000 rebate on their $1,000/month specialty medication would meet their deductible in the very first month of the year, without accruing any actual out-of-pocket expenses.  This would jeopardize the integrity of the program, particularly with respect to patients on high deductible health plans' eligibility for health savings account reimbursements. It would also impact Avera's bottom line. The sooner patients' deductibles are met, the sooner Avera

becomes responsible for paying the full amount of any high-dollar medications for the remainder of the calendar year.

54.     Ordinarily, CVS will only credit the correct amounts and apply this accumulator adjustment if the member used the CVS Specialty Pharmacy exclusively.  Avera, however, used three independent specialty pharmacies: Avera Specialty Pharmacy (its own, in-house specialty pharmacy), Monument Health Home+ Specialty Pharmacy, and Fairview Specialty Pharmacy. Because Avera did not use CVS's Specialty Pharmacy exclusively, this presented a unique challenge for Avera because any claims processed using these specialty pharmacies would not receive the accumulator adjustment from CVS, which jeopardized the integrity of the program.

55.     Had Avera tried to approach CVS on its own, without VPS, CVS almost certainly would have declined setting up this complicated coordination of benefits. As a general rule, CVS does not accommodate specialty pharmacies other than its own for accumulator adjustments. Accordingly, if Avera had tried to implement this plan on its own, it would be unable to appropriately adjust the deductible credits and, ultimately, would have had to either forego any program redesign, and the millions of dollars of associated savings, or abandon its preferred specialty pharmacies in favor of CVS Specialty Pharmacy.

56.     VPS used its relationship with CVS to persuade it to recognize Avera's specialty pharmacies for purposes of the accumulator adjustment. VPS's work made it possible for Avera to keep its specialty pharmacies and continue with the new program.

57.     Creating a process to coordinate benefits and share information between the specialty pharmacies and the claims adjudicator in order to apply an accumulator adjustment also required months of intense coordination, negotiation, and work.

58.     Among other things, VPS created secure file transfer portals ("**SFTPs**"), created a workable file format, and acted as a liaison between CVS, Avera, and each of the separate specialty pharmacies in order to create a secure flow of information between CVS and Avera's preferred specialty pharmacies.

59.     VPS also taught managers and personnel at three different specialty pharmacies how to implement VPS's program, provide data to their IT departments, perform file extracts for each pharmacy, and conduct multiple trials and correct all errors to make sure that the data was transferring properly.

60.     Based on its industry relationships, VPS connected Avera with subject matter experts that saved Avera countless hours of research and setup time necessary to adjust accumulators.

61.     In addition, VPS worked with CVS's account team to ensure that all accounts were in place, coded, and ready to go for Avera's implementation date of January 1, 2021.

62.     On August 20, 2020, Avera asked VPS to turn on the accumulator adjustment for all lines of Avera's health plan, effective January 1, 2021. VPS made arrangements to do so.

**VPS's and Avera's Continued Negotiation of a Master Services Agreement**

63.     Against the backdrop of VPS's extensive and continued work to develop, validate, and implement a new program for Avera, VPS and Avera—through Avera and Avera's agent, Axia—were continuing to negotiate a master services agreement ("**MSA**") contemplating an ongoing services relationship between VPS and Avera.

64.     On July 7, 2020, VPS sent a detailed MSA to Axia, which replied and inserted questions and comments, including a question from Avera about the insertion of a service level

agreement to hold VPS accountable if specific guarantees related to deadlines and savings were not met.

65.     On August 12, 2020, VPS replied to these comments in good faith, indicating that while it did not have a service level agreement or guarantees in its other contracts, it was willing to consider adding some to the MSA.

66.     On August 20, 2020, Avera and VPS had a call.  It was during this call that Avera asked VPS to turn on the accumulator adjustment VPS had coordinated with CVS for each of the three Avera companies. In reliance on Avera's agreement to the commission fee structure, execution of the non-disclosure agreement, and continued and fully-engaged participation in the project, VPS agreed.

67.     The Parties continued negotiating the MSA on a September 3, 2020 conference call and in a September 21, 2020 email. In connection with VPS's continued efforts to implement the new program, VPS also provided Avera with detailed instructions and education about the SFTP protocols needed to manage the CVS coordination of benefits.

68.     At this point, the program was essentially operable and ready to go live on January 1, 2021. In good faith and in reliance on Avera's commitment to pay for VPS's services and continued engagement in the project, VPS continued following Avera's directions with respect to performing work on the program and provided all of the tools, implementation services, and information Avera would need to operate the program on its own.

69.     On October 14, 2020, VPS sent Axia a final draft of the MSA, which Axia in turn sent to Avera.  The parties then engaged in some additional phone calls over the next several days.

70.     The draft of the MSA incorporated the terms that Avera and VPS had previously discussed and agreed upon, including the agreement that Avera would provide VPS with a 20

percent commission on the savings that Avera received from VPS's program. The commission was estimated to be approximately three million dollars.

71.     As previously discussed, the purpose of the commission was to compensate VPS— in lieu of an upfront fee and contemporaneous payment—for designing the new program, using its proprietary process for validating the new program, educating and counseling Avera about how it would need to set up and maintain the new program, sharing its proprietary knowledge and industry relationships with Avera, managing the implementation of Avera's new program (including performing extensive work to develop a process for the accumulator adjustment), and communicating with and educating Avera's end users about how to access and use their new benefits.

### Avera Abruptly Ends its Relationship with VPS Prior to Executing the MSA, But After Receiving All of VPS's Work Product

72.     In preparation for executing the final step of customer communication and education, VPS had prepared a notification letter to be sent to Avera's affected customers. Across Avera's three companies, it has approximately 1,100 specialty pharmacy customers.

73.     To meet Avera's requested timeline, VPS printed out and stuffed these letters to be mailed several weeks before the year's end, in order to prepare customers for the plan design change and give them an opportunity to contact VPS for more information, if needed.

74.     To VPS's surprise, on October 26, 2020, Avera asked if it could handle all customer communications instead of VPS, including sending notification letters to end users, in exchange for a discount on VPS's services. VPS had already prepared the entire process flow for all customer service advocates, so Avera simply had to follow the plan VPS had already created. In addition, VPS had already drafted the notification letter and performed the work of printing and

preparing thousands of letters for mailing. However, VPS was willing to consider Avera's request as a good faith gesture. VPS offered Avera a ten percent discount if Avera wanted to take on the customer communication piece. This would put VPS's compensation at an 18 percent commission on the savings Avera would receive from implementing the plan, or approximately 2.6 million dollars.

75.     During the same call on October 26, 2020, and after conveying disappointment that VPS would not offer a greater discount, Avera feigned surprise at one component of the program related to participants on high deductible health plans.

76.     Specifically, VPS's plan had built in a "default copay" (in an amount of Avera's choosing) for patients who run out of funds on copay cards, so that the patients themselves do not have to foot pharmacy bills for thousands of dollars. The high deductible patient would pay the default copay of, for example, $150, and VPS would build in a safety net for Avera to cover the rest of the cost in these circumstances.

77.     Avera suddenly expressed surprise at this component of the program, despite the fact that VPS had provided this information to Avera multiple times and during multiple calls since February 2020.

78.     It was not until after Avera had everything that it needed from VPS to implement the new program that Avera expressed surprise at the high deductible component.

79.     Nevertheless, to alleviate Avera's newly-voiced concerns concerning the high deductible patients, VPS quickly worked to develop two alternatives. VPS also consulted with several industry contacts, including Avera's agent, Axia, to again confirm the soundness of VPS's original program with respect to high deductible patients, as well as to consider whether there were any additional alternatives.

16

80.     After conducting this investigation, VPS called Avera on October 29, 2020, to reaffirm that VPS's program complied with applicable coverage requirements, as well as to propose the alternatives VPS had developed.

81.     Although the high deductible component had been repeatedly, directly, and indirectly communicated to Avera for months, during this call, Avera again informed VPS it had grave concerns about the component. Despite VPS's independent consultations and reasonable alternatives to address this issue, Avera was adamant that it was not going to proceed with implementation of any part of the new program—whether high deductible or PPO. Rather, Avera stated that it no longer desired to work with VPS on implementing any component of the new program.

82.     In addition, on or about November 5, 2020, Avera curiously insisted for the first time—after nine months of extensive work to design and implement a new program—that VPS had provided nothing of value, that Avera intended to keep the coinsurance and copay limit changes it had filed with Minnesota and South Dakota, that it would have made these benefit changes on its own (without VPS's recommendation and analysis), and that VPS's information and recommendations were not proprietary. According to Avera, it was too late to file any plan design changes for 2020, so it would keep the 20 percent coinsurance change, but would not implement the rest of VPS's program.

83.     VPS pushed back, reminding Avera that it had provided indispensable services, information, and work product to develop a program that would provide tremendous value to Avera. VPS also proposed various payment options that could be arranged for a partial implementation.

17

84.     Thereafter, on December 7, 2020, Dr. Luke Merkel called Dave Lee, the managing director of VPS, for a final discussion. Dr. Merkel informed Mr. Lee that it was "too late" to do anything for 2021 and that he was "done talking," but that Mr. Lee could reach out to him in early 2021 to see if VPS could set something up for Avera for 2022.

85.     During this call, Dr. Merkel informed Mr. Lee that he had told everyone at Avera to put the program change on hold.  He also represented that he would destroy the plan-related letters and they would not be going out to Avera's members. Unbeknownst to Mr. Lee at the time, Dr. Merkel's statement was apparently intended to mislead VPS into believing that Avera would not be misappropriating VPS's work product.

86.     Dr. Merkel again reiterated Avera's new contention that VPS's new program was not proprietary, and Avera would not be paying VPS anything at all for its extensive work for Avera.

**An Amendment of Benefits Letter from Avera to Plan Members
Reveals Avera's Fraud and Theft of VPS's Work**

87.     In January 2021, VPS received a phone call from one of Avera's members, Clark Community Oil. The member had received a letter explaining certain amendments to Avera's health insurance for 2021, and this letter had included VPS's telephone number. A true and accurate copy of this letter, which was postmarked December 22, 2020, is attached to this Complaint as **Exhibit B**.

88.     Tellingly, this letter incorporated the language that VPS had provided to Avera in the spring of 2020, and Avera had failed to remove VPS's telephone number from the copied language.

18

89.     VPS first provided this language to Avera in March 2020. Unusually, in May 2020, Avera requested this specific language again. Both of VPS's emails to Avera contained the following statement, including the bolded and italicized prefatory note:

> *[Only include the following sentences if you use the Specialty Copay Assistance program.]* To help offset your out-of-pocket costs for specialty medications, a Specialty Copay Assistance program is available to you. The clinical team at VPS will help you receive manufacturer copay assistance to cover most, if not all, of your out-of-pocket expenses for your specialty medications. For more information and to enroll in the program, contact VPS at 1-888-201-9175 prior to filling your specialty medication.

90.     Avera's December 2020 letter adopted this language almost word for word. The letter was describing certain amendments to patients' coverage that would be effective January 1, 2021:

> The "What I Pay for Prescriptions" section of your Certificate of Coverage is amended by adding the following language:
>
> > To help offset your out-of-pocket costs for specialty drugs, you will be enrolled into a Specialty Copay Assistance program. This Specialty Copay Assistance program will help you receive manufacturer copay assistance to cover most, if not all, of your out-of-pocket expenses for your specialty medications. If copayment assistance is used, you will not receive credit toward your maximum out-of-pocket or deductible for any amount applied to a manufacturer coupon or assistance. For more information contact VPS at 1-888-201-9175 prior to filling your specialty drug.

91.     As demonstrated by the language VPS provided to Avera set out in paragraph 89 above, this reference to such an amendment cannot be explained as a simple clerical error. This language would *only* be applicable if Avera had implemented the specialty copay assistance program developed by VPS. Avera also customized this language to delete the first reference to VPS, and added additional language addressing the high deductible component that had allegedly prevented it from moving forward with VPS's program. This additional language (i.e. "[i]f

copayment assistance is used, you will not receive credit toward your maximum out-of-pocket or deductible for any amount applied to a manufacturer coupon or assistance") necessarily meant Avera was relying on the CVS accumulator adjustment VPS had designed and set up for Avera.

92.     This was not an isolated incident. VPS received another phone call from the employee of another Avera member, B&G Transportation, on March 2, 2021 asking about the specialty copay assistance program. This customer received a copy of the same Avera amendment letter via email on January 7, 2021.

93.     Again, on March 19, 2021, VPS received a phone call from the employee of a third Avera member, NESD Head Start. This employee stated she had received the same amendment letter from Avera that incorporated the same reference to VPS for prescription savings.

94.     Based on the language of Avera's letter, it is clear that Avera implemented and is using VPS's program for its members, including the complex coordination of benefits with CVS that VPS performed for Avera to ensure the application of an accumulator adjustment.

## COUNT I
## FRAUDULENT INDUCEMENT

95.     VPS hereby realleges all other allegations set forth in this Complaint and incorporates them by reference as if fully set forth herein.

96.     Avera's fraudulent misrepresentations and concealments induced VPS to provide Avera with extensive information, services, and work product. Avera intended VPS to rely on these representations or omissions in performing the work for Avera, but never intended to pay VPS. Ultimately, Avera attempted to cover its tracks and justify its refusal to pay VPS by feigning surprise and displeasure with a long-known element of the plan, falsely claiming that VPS

provided Avera with nothing of value, and falsely stating that Avera would not be implementing any part of its program.

97.     Avera made several fraudulent statements of material fact concerning Avera's agreement and commitment to pay for VPS's work, upon which VPS relied in performing and providing work to Avera, including but not limited to:

      a)     In February 2020, March 2020, and May 2020, Luke Merkel of Avera told VPS that it understood the commission structure and would pay VPS for VPS's work;

      b)     On April 10, 2020, Luke Merkel stated on a call with Nelly Rose and Dave Lee of Avera that he was committed to working with VPS and to getting something in place for January 1, 2021;

      c)     At a meeting in May 2020, Luke Merkel told VPS that the fact Avera was filing a plan design change meant that Avera was moving forward with the agreement;

      d)     On June 11, 2020, on a call with individuals from Avera, Axia, VPS, and the CVS group, Luke Merkel stated that Avera was "in operation mode" with VPS's program.

98.     Avera either had a present intent not to pay VPS at the time it promised to do so, or it quickly developed an intention not to pay. Avera knew that VPS was relying on Avera's representations and had a duty to disclose the truth—that it did not intend to pay—before VPS provided or continued to provide information, services, and work product to Avera.

99.     Avera failed to disclose its intention not to pay and continued to request, receive, and retain VPS's information, services, and work product.

100.     Avera had a duty to disclose its intent, because VPS placed a special confidence in Avera and provided Avera with proprietary knowledge, services, and work product in reliance on

Avera's representations, Avera had superior knowledge about its own intentions, and this information was not within the fair and reasonable reach of VPS.

101.    Avera made a number of additional false statements and took actions in furtherance of its fraud and in an attempt to hide its fraud and continue to mislead VPS, including but not limited to:

a)   On May 8, 2020, Dr. Merkel requested the specific summary plan description and summary of benefits and coverage language to incorporate into benefit documents and customer communications;

b)   In July 2020, Dr. Merkel granted VPS access to its CVS portal for Avera claims data and distribution;

c)   In July 2020, Dr. Merkel approved the member letter communication directing members to VPS.

d)   Other miscellaneous requests and actions throughout the parties' nine-month relationship, including setting up file extracts for VPS to access data, requesting service level agreements for the MSA, and paying CVS thousands of dollars for IT testing;

e)   At meetings on October 26 and October 29, 2020, Dr. Merkel suddenly feigned concern about a high deductible component of the program, of which Avera had been made aware multiple times over the course of the preceding months;

f)   In November 2020, in response to VPS's concerns about member communications expressed after Avera stated it would not be moving forward, Dr. Merkel replied that Avera would not be sending member communications or using the language VPS had provided, and that Avera's members would have to rely on their benefits documents for plan changes;

g)   On December 7, 2020, Dr. Merkel told VPS that Avera was not going to implement VPS's program in 2021;

h)   On December 7, 2020, Dr. Merkel told VPS to contact him in a few months for a possible implementation in 2022; and

i)   On December 7, 2020, Dr. Merkel also told VPS that its benefits plan change with the states of Minnesota and South Dakota was not proprietary to VPS.

102.    Avera knew its statements to be false.

22

103.    Through Avera's fraudulent misrepresentations and concealments, Avera intended to induce VPS to share its proprietary information, analyze Avera's customer data, set up a coordination of benefits with CVS, manage the implementation of Avera's program change, and provide other information, services, and work product in connection with a new specialty pharmacy benefit program.   This allowed Avera to maximize manufacturer assistance for specialty pharmacy drugs; keep its preferred specialty pharmacies Avera, Monumental, and Fairview; and keep one hundred percent of its substantial savings, rather than paying VPS's commission.

104.    Relying on Avera's fraudulent misrepresentations and concealments, VPS provided proprietary information, indispensable services, and work product without which Avera could not have implemented the new program.

105.    Avera's fraudulent misrepresentations and concealments induced VPS to provide Avera with this information, services, and work product. Avera intended VPS to rely on these misrepresentations and concealments in performing the work for Avera, but never intended to pay VPS.  Avera only disclosed that it did not intend to pay VPS after VPS had provided all of the program information and components that Avera needed.

106.    As a result, VPS was damaged.

107.    Avera's actions were willful, malicious, and made in conscious disregard of the rights of VPS.

WHEREFORE, Plaintiff VPS prays that this Court enter a Judgment in its favor and against Defendant Avera, award VPS actual and exemplary damages, along with interest and VPS's

attorneys' fees, legal expenses, and court costs incurred in instituting and prosecuting this action, and/or other sums provided by law, and grant such other relief as is just and proper.

## COUNT II
## BREACH OF CONTRACT
## (SERVICES AGREEMENT)

108.    VPS hereby realleges all other allegations set forth in this Complaint and incorporates them by reference as if fully set forth herein.

109.    Avera stated it would pay VPS for the information, services, and work product that VPS provided by paying VPS a percentage of the savings that resulted from VPS's work.

110.    Specifically, VPS offered its services, information, and work product in exchange for a twenty percent commission on Avera's total savings, and in April 2020, Avera committed to VPS's implementation of the plan with a January 1, 2021 completion date.

111.     Avera also accepted VPS's performance.

112.    VPS relied on Avera's acceptance and its promises that it would pay to VPS's detriment, in VPS fully performing its duties and obligations under the parties' agreement.

113.    Avera failed to perform its obligations pursuant to these agreements, including failing to pay the amount due to VPS and failing to execute the MSA.

114.    Despite VPS's performance and the information, services, and work product provided to Avera, Avera has failed and refused to pay the amounts due and owing to VPS for the information, services, and work product that VPS provided to Avera and Avera remains in breach of the parties' agreement.

115.    The breach will result in a loss of at least 3 million dollars to VPS.

24

WHEREFORE, Plaintiff VPS prays that this Court enter a Judgment in its favor and against Defendant Avera, require Avera to specifically perform the terms of the parties' agreement, including paying VPS a portion of the savings realized from Avera's use of the services and work product provided by VPS, or alternatively award VPS damages, and enter an award of interest and VPS's  attorneys' fees, legal expenses, and court costs incurred in instituting and prosecuting this action, and/or other sums provided by law, and grant such other relief as is just and proper.

## COUNT III
## QUANTUM MERUIT

116.    VPS hereby realleges all other allegations set forth in this Complaint and incorporates them by reference as if fully set forth herein.

117.    VPS pleads its quantum meruit claim in the alternative to its breach of contract and unjust enrichment claims under Counts II and IV of this Complaint.

118.    Avera expressly or impliedly promised to pay reasonable and just compensation for the substantial benefits VPS conferred on Avera, including the information, services, and work product provided by VPS to Avera.

119.    The benefits VPS conferred on Avera include providing it with proprietary information gained after years of industry experience, implementing a crucial coordination of benefits between Avera and CVS, and providing hundreds of hours of consultation and analysis in order to ensure the soundness of a new program for Avera, as well as other services and work product. Avera benefitted from this assistance and will continue to reap approximately five million dollars in savings per year, and Avera has been unjustly enriched at the expense of VPS.

25

120.    Despite VPS's provision of information, performance of services, and delivery of work product, Avera has failed and refused to pay the full, fair, and reasonable value of VPS's information, services, and work product and the costs associated therewith.

121.    VPS has fully performed its obligations to Avera and satisfied all conditions precedent to its right to payment and institution of this action.

122.    As a result of Avera's failure to pay the full, fair, and reasonable value of VPS's information, services, work product, and associated costs, VPS has suffered damages in excess of three million dollars.

123.    VPS made a demand on Avera for payment of the amounts due and owing to VPS in December 2020. Accordingly, VPS is entitled to an award of prejudgment interest.

WHEREFORE, Plaintiff VPS prays that this Court enter a Judgment in its favor and against Defendant Avera, award VPS actual and exemplary damages, along with interest and VPS's attorneys' fees, legal expenses, and court costs incurred in instituting and prosecuting this action, and/or other sums provided by law, and grant such other relief as is just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**

124.    VPS hereby realleges all other allegations set forth in this Complaint and incorporates them by reference as if fully set forth herein.

125.    VPS pleads its unjust enrichment claim in the alternative to its breach of contract and quantum meruit claims under Counts II and III of this Complaint.

126.    VPS conferred a benefit on Avera by providing it with services in furtherance of the development of a new program, implementing a crucial coordination of benefits between Avera and CVS, and providing hundreds of hours of consultation and analysis in order to ensure

the soundness of a new program for Avera, as well as other services and work product. Avera benefitted from this assistance and will continue to benefit to the tune of approximately five million dollars in savings per year, and Avera has been unjustly enriched, at the expense of VPS.

127.     This unlawful retention of benefits by Avera has been to the detriment of VPS, and allowing Avera to retain these benefits without payment to VPS violates fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff VPS prays that this Court enter a Judgment in its favor and against Defendant Avera, award VPS actual and exemplary damages, along with interest and VPS's attorneys' fees, legal expenses, and court costs incurred in instituting and prosecuting this action, and/or other sums provided by law, and grant such other relief as is just and proper.

## COUNT V
## BREACH OF CONTRACT
## (NON-DISCLOSURE AGREEMENT)

128.     VPS hereby realleges all other allegations set forth in this Complaint and incorporates them by reference as if fully set forth herein.

129.     VPS provided Avera with confidential information as defined by the non-disclosure agreement. *See* Ex. A at p. 1.

130.     Avera agreed not to disclose this confidential information and further agreed not to use this confidential information "for profit or otherwise in any way detrimental to" VPS. Ex. A at p. 2.

131.     Avera also agreed to "promptly return or destroy all Confidential Information and/or all tangible materials embodying Confidential Information . . . following the occurrence of any event that makes the Parties' possession of the Confidential Information unnecessary[.]" Ex. A at p. 2.

132.   Avera agreed that VPS' confidential information was "of a special, unique, and extraordinary character and that disclosure or other use of such information in violation of this Agreement will cause immediate and irreparable harm." Ex. A at pp. 2–3.

133.   VPS performed its obligations under the non-disclosure agreement.

134.   However, in violation of the non-disclosure agreement, Avera disclosed, used, and retained VPS' confidential information.

135.   This breach has caused immediate and irreparable harm, and damages in the amount of at least 3 million dollars.

WHEREFORE, Plaintiff VPS prays that this Court enter a Judgment in its favor and against Defendant Avera, require Avera to specifically perform the terms of the parties' agreement, including destroying any of VPS's information in Avera's possession, award VPS damages, enter an award of interest and VPS's  attorneys' fees, legal expenses, and court costs incurred in instituting and prosecuting this action, and/or other sums provided by law, and grant such other relief as is just and proper.


PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated: March 1, 2022                    Respectfully Submitted:


ROBINS KAPLAN LLP

    */s/ Timothy W. Billion*
    Brendan V. Johnson (S.D. Bar # 3263)
    Timothy W. Billion (S.D. Bar # 4641)
    140 N. Phillips Ave., Ste 307
    Sioux Falls, SD 57104
    605-335-1300
    BJohnson@RobinsKaplan.com
    TBillion@robinskaplan.com

    and

ARMSTRONG TEASDALE LLP

    Jeffrey L. Schultz     (*pro hac vice forthcoming*)
    Angela B. Kennedy   (*pro hac vice forthcoming*)
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    jschultz@atllp.com
    akennedy@atllp.com

ATTORNEYS FOR PLAINTIFF

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
VALUED PHARMACY SERVICES OF THE MIDWEST, LLC D/B/A NFP RX SOLUTIONS

### DEFENDANTS
AVERA HEALTH PLANS, INC.

**(b)**  County of Residence of First Listed Plaintiff    St. Louis County, MO
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Timothy W. Billion, Robins Kaplan LLP
140 North Phillips Avenue, Suite 307
Sioux Falls, SD 57104, 605-740-7102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                               *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1  Original Proceeding | ☐ 2  Removed from State Court | ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened | ☐ 5  Transferred from Another District *(specify)* | ☐ 6  Multidistrict Litigation - Transfer | ☐ 8  Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Claims for fraudulent misrepresentation and alternative contractual claims related to pharmacy benefit services.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$3,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
03/01/2022

SIGNATURE OF ATTORNEY OF RECORD
*/s/ Timothy W. Billion*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____